Emory **SEARCEY, et al., Plaintiffs,**

v.

Alonzo **CRIM, et al., Defendants.**

**No. 1:84–CV–751–MHS.**

United States District Court, N.D. Georgia, Atlanta Division.

March 4, 1988.

Ralph Goldberg, Atlanta, Ga., for plaintiffs.

Bruce Beerman, Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.

## I. INTRODUCTION

The Atlanta Peace Alliance ("APA") and several individual peace activists brought this action for declaratory and injunctive relief alleging that the Atlanta Board of Education ("Board)" violated their First and Fourteenth Amendment rights by arbitrarily and capriciously denying them permission to use established channels in the Atlanta public schools to present information to students concerning educational and career opportunities related to peace. Plaintiffs seek an opportunity equal to that

afforded military recruiters to place their literature on school bulletin boards and in the offices of school guidance officers and to participate in school "Career Days" and "Youth Motivation Days."

By order dated August 13, 1986, the Court granted partial summary judgment in favor of plaintiffs and entered a preliminary injunction, enjoining the Board from denying the APA an opportunity, substantially equal to that afforded military recruiters, to present peace-oriented educational and career opportunities to Atlanta public school students by placing literature on school bulletin boards and in guidance offices and by participating in Career Day programs.[1] The Court deferred until trial the question of whether defendants had so opened the school to outside expression that they must also allow plaintiffs to discuss the merits of military services more generally.

The Board filed an interlocutory appeal. On April 17, 1987, the United States Court of Appeals for the Eleventh Circuit affirmed the relief granted in this Court's order, vacated the finding that the Board had created a limited public forum, and remanded the case for further proceedings. The case was tried before this Court in October 1987. Each party has now submitted proposed findings of fact and conclusions of law and has had an opportunity to comment on the Board's "Career Day Program Administrative Regulations" that were promulgated after the trial of this action had concluded.

This Court must now determine whether the Career Days and Youth Motivation Days programs and the school bulletin boards and guidance counselors' offices constitute public or non-public forums, and whether and on what basis the Board may properly deny plaintiffs access to these forums.

## II. FINDINGS OF FACT

### A. Parties

The Atlanta Peace Alliance is a coalition of individuals and groups organized for the purpose of providing high school students in Atlanta with information on careers and educational opportunities related to peace as well as information to help them make informed choices concerning military enlistment. The other plaintiffs in this case are individual members of the APA, parents, teachers, and students.

The Atlanta Board of Education is the duly constituted entity organized and existing under the constitution and laws of the state. of Georgia which operates and manages the public school system within the corporate limits of the City of Atlanta.

Dr. Alonzo A. Crim is and was at all times pertinent to this law suit employed by the Board as the Superintendent of Schools. As Superintendent of Schools he is the chief executive officer of the Board and is responsible for the administrative enforcement and execution of policies of the Atlanta Board of Education. He is familiar with the policies of the Board as they existed during all periods pertinent to this case.

The United States intervened in this action to represent the armed services' recruiting interests.

### B. Access to the Schools

#### 1. *Career and Youth Motivation Days*

The Board has historically sought to protect its educational mission by limiting public access to the schools. For example, Board policy requires visitors to the schools to obtain a "Visitor's Permit"; and visitors' rights of access to the school are subject to the discretion of the school principal. (Defendants' Exhibit, "D. Ex.," #1.) Similarly, Board policy restricts the distribution of flyers, brochures and pamphlets within the school building. (D. Ex. #2.) At the same time, however, the Board has sought to improve the post-secondary opportunities available to the Atlanta public school students, of whom 92% may be classified as

---

1. The Court did not enjoin defendants from denying plaintiffs access to Youth Motivation Days because the record was not clear at that time whether plaintiffs had ever sought and been denied access to these programs.

"minority" students and 85% may be classified as "poor," by involving the local community in employment or career-oriented programs in the schools. (Trial Transcript, "Tr.," at 521.) More than fifteen years ago a group called the Merit Employers Association began working with the schools, planning activities designed to raise students' employment expectations, to encourage students to aspire to high goals in spite of racism, and to assure students that opportunities for success do exist for them. (Tr. at 521–524.) These activities gradually evolved into several somewhat distinct programs. At "Youth Motivation Day" community members recruited by the Merit Employers Association and the school staff come into the school and share with the students their methods for negotiating life's obstacles and securing responsible positions in business and industry. (Tr. at 523.) At "Career Day" community members speak with students about more concrete or specific job choices and opportunities and hand out printed career information. (Tr. at 524.) At some schools the two activities are combined into one event. Other schools present several Career Days or Youth Motivation Days during the course of the year and enlist the aid of other organizations, such as the Atlanta Exchange, an organization of black professionals, to recruit speakers. (Tr. at 364.)

Although the career education programs may vary in format, they generally begin with an assembly of the entire school and a keynote address. Then the students break up into small groups and go to classrooms where they are addressed by representatives of various career fields. (Tr. at 364–366.) At some schools, or on some occasions, the students are allowed to choose which presentation they would like to attend. Often they are required to attend specific presentations and may hear about a career that they have no interest in at all.[2] (Tr. at 432.)

In January 1977, the Board adopted a career education policy. The policy endorsed the development of career education to enable "students of all ages to examine their attitudes, interests, aptitudes, and abilities in order to relate them to career opportunities, and to make valid decisions regarding further education and future endeavors." (D. Ex. 6.) This statement of general support for career education was the only written policy relating to the Career and Youth Motivation Day programs prior to March 9, 1987. Thus, prior to March 9, 1987, the Board had no written policy concerning limitations on the types of groups or individuals who could participate in these programs or the topics that could be addressed. (Tr. at 560.)

Prior to March 9, 1987, individuals and groups were generally invited by the Merit Employers Association, a principal or a staff member to participate in the programs. (Tr. at 562.) They were told the purpose of program, but were given wide latitude in making their presentations. (Tr. at 235, 278, 627.) Although a school staff member was present during the presentations, the staff members did not generally intervene in, limit or censor the Career Day or Youth Motivation Day discussions. It was not uncommon for a speaker at Career Day to talk about the advantages or benefits of his company and to name other companies that did not offer such benefits. (Tr. at 439.) Speakers at Youth Motivation Day were not restricted from expressing their disagreement about how to achieve success in business. (Tr. at 625.) Speakers also expressed differing ideas about what constitutes success. (Tr. at 236, 249.) Further, speakers conducted discussions with students that touched on issues ranging from employment discrimination (Tr. at 366) to government spending and "Star Wars." (Tr. at 233.)

The Board exercised little or no control over who would be allowed to speak, what written material would be distributed, or what topics would be discussed at these programs. These decisions were left to the

---

**2.** The Atlanta public school students also attend a career and college fair called "Dream Jamboree" sponsored by the City of Atlanta. At Dream Jamboree college and career representatives set up booths at the Civic Center and students are allowed to wander from booth to booth. (Tr. at 331, 638.) Access to Dream Jamboree is not at issue in this action.

discretion of school principals. (Tr. at 562.) Prior to October 1983, the Board did not exclude any group or individual from participating in the career education programs based on the type of post-secondary pursuit he or she wanted to discuss. Many types of jobs and professions including the military were represented.

### 2. *Guidance Offices and Bulletin Boards*

Information about post-secondary pursuits is also disseminated to the students through the offices of guidance counselors and designated school bulletin boards. Throughout the year, guidance counselors meet with students individually and in groups to discuss their college and career choices. Guidance counselors routinely distribute printed material provided to the schools by outside groups containing information about careers and colleges. Generally, such material is distributed in accordance with the guidance counselor's individual assessment of whether the material is appropriate and helpful to a particular student or group of students. Some literature is simply available in the guidance offices for those students who choose to pick it up. (Tr. at 634–635, 645–646.)

The guidance offices also arrange student meetings with college, career and military recruiters. They also place printed career and college information on bulletin boards within the school. Meetings and postings are routinely made at the request of the outside groups. (Tr. at 639.)

### C. The APA's Experience

On February 21, 1983, the APA sent a letter to each of the principals of Atlanta's 22 public high schools. The letter requested permission to place literature in guidance offices "concerning military recruiters, military life, draft counseling, conscientious objection, and careers in peace making ...; set up tables promoting a career as a peace maker at Career Days ...; speak in forums where pro-military speakers are present; and place paid advertisements in ... school newspaper[s]." (P.Ex. 34.)

On April 4, 1983, APA representatives presented the APA proposal at a public meeting of the Board. No decision regarding the APA request was issued. (Tr. at 147–148.) In May 1983, the principals of Fulton and East Atlanta high schools accepted the APA literature to be placed in their guidance offices. (Tr. at 149.) On June 6, 1983, APA representatives met with Dr. Crim to discuss the proposal that the APA had made to the Board. Dr. Crim had read some of the APA literature and found most of it to be good and objective and suitable for educational purposes. (Tr. at 575.) At this meeting with the APA, Dr. Crim agreed to distribute materials supplied by the APA to guidance offices; to allow the APA to set up a table at Career Day; to make a list of APA speakers available to the high schools; and to allow the APA to place paid advertisements in the school year books. (Tr. at 153, 562–563, 570.)

On July 15, 1983, Dr. Crim discussed his agreement with the APA in a radio interview by Tom Houck. (Tr. at 156.) Following that interview the *Atlanta Journal* published an editorial entitled, "Don't Peddle Propaganda on School Career Days." (P.Ex. 56.) The article accused Dr. Crim of mixing career counseling with "radical politics." It opined that careers in peace making are careers in the military. The article labeled the APA's viewpoint "propaganda" and urged the Board to exclude it.

The editorial caused quite a stir within the Board. (Tr. at 588.) After the editorial appeared, the Board reviewed Dr. Crim's administrative decision regarding the APA and directed Dr. Crim to suspend his decision to allow the APA to participate in Career Days and to distribute their printed materials until it could be discussed at a meeting of the Planning Committee. (P.Ex. 57.) After a public meeting of the Planning Committee on October 4, 1983, the Board retired to executive session. The Board then announced that it had "totally suspended" the APA from Atlanta's public schools, and empowered Dr. Crim to develop a policy governing Career Days. (Tr. at 62–64, 163–164, 589–591.)

In April 1984, when the Board had not adopted any policy regarding access to Career Days, and the APA was still being completely excluded from the public schools, the APA filed this suit. The Board did not adopt any Career Day policy until March 9, 1987, more than three and a half years after it decided to exclude the APA, and seven months after this Court entered a preliminary injunction against the Board and urged the Board to proceed to formulate and adopt a written policy.

The record is clear that the Board considered the APA's viewpoint to be highly controversial. (Tr. at 590.) One Board member evidently found the APA's views so offensive that he would not even review APA literature during the Planning Committee meeting. (Tr. at 163.) The Board did not inform the APA which of their printed material the Board deemed inappropriate or what topics should not be discussed at Career Days. Rather, the Board completely suspended the APA from all public schools pending formulation of an access policy that it did not develop until over three and a half years later. During this period, the Board excluded the APA, but no other group. These facts lead this Court to conclude that the Board's purpose in suspending Dr. Crim's decision and excluding the APA was to suppress the APA's viewpoint.

On March 9, 1987, the Board adopted a Career Day policy. Administrative regulations implementing the Board's policy were approved and adopted by Dr. Crim on November 6, 1987. A copy of the complete text of the policy and the regulations are annexed to this order as appendices "A" and "B". Certain portions of the policy and regulations are crafted specifically to allow the Board to exclude the APA from Career Day programs. These sections, discussed below, were included in an effort to suppress the APA's viewpoint.

Plaintiffs presented voluminous and convincing evidence that most of the material they seek to provide to the students would be helpful in making decisions regarding peacemaking careers and military enlistment.[3] In particular, the Court found Admiral Gene R. LaRocque to be a very knowledgeable and credible witness. On the basis of his many years of service in the military and contact with scores of new recruits, he concluded that the information provided by the APA would be useful to prospective recruits. He stated further that, "We would have greater security as a nation if these young people knew what they were getting into and then wholeheartedly supported it while they were in the service." (Tr. at 111.)

## III. CONCLUSIONS OF LAW

### A. Public Forum Analysis

Freedom of speech is one of this nation's most cherished rights. It is one of the precious characteristics of democracy that our military has fought to defend throughout this nation's history and all over the world. According to Admiral LaRocque, free speech is "the thing" that separates this nation from the ninety-seven foreign countries he has visited during his long service in the military. (Tr. at 141.) The First Amendment does not, however, require the government to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. *Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447–3448, 87 L.Ed.2d 567 (1985). Rather, the exercise of free speech may be limited to varying degrees depending on the nature and traditional use of the forum. *Id.* at 800, 105 S.Ct. at 3448.

The government may exclude speakers from traditional and designated public forums on the basis of the content of their message only when the exclusion is necessary to serve a compelling governmental

---

**3.** During trial, intervenor-defendant repeatedly asserted that some statements in plaintiffs' printed materials were inaccurate. This Court will not determine the accuracy of each of plaintiffs' pamphlets because that determination is not necessary to rule on the First Amendment issues at hand.

interest and is narrowly tailored to serve that interest. *Id.* at 800, 105 S.Ct. at 3448; see also *Searcey v. Crim*, 815 F.2d 1389, 1391 (11th Cir.1987). Restrictions on access to a nonpublic forum "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451. Also, the government may not deny access to a speaker in a nonpublic forum solely to suppress the point of view he or she espouses on a subject otherwise includible within that forum. *Id.* at 806, 105 S.Ct. at 3451.

Recent cases have made it clear that public school facilities do not bear the attributes of traditional public forums and "may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983) or by some segment of the public; such as student organizations." *Hazelwood School District v. Kuhlmeier*, — U.S. —, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988). Further, "[t]he government does not create a forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449.

To determine whether a public forum has been intentionally created, the Court must consider (1) the policy and practice of the government, and (2) the nature of the property and its compatibility with expressive activity. *Id.* at 802, 105 S.Ct. at 3449. In considering whether the policy and practice of the government demonstrates an intent to create a public forum, courts have often looked at the degree of control that the government traditionally exercised over the expressive activity. For example, in *Perry* the fact that it was necessary to obtain the school principal's permission before using the internal mail system weighed heavily in the court's determination that the mail system was not a created public forum. *Perry*, 460 U.S. at 47, 103 S.Ct. at 956; *see*

*also Cornelius*, 473 U.S. at 802–803, 105 S.Ct. at 3449–3450; *Lehman v. City of Shaker Heights*, 418 U.S. 298, 299–300, 94 S.Ct. 2714, 2715–2716, 41 L.Ed.2d 770 (1974); *Student Coalition for Peace v. Lower Marion School Dist. Board of School Directors*, 776 F.2d 431 (3rd Cir. 1985).

In deciding whether the nature of the property is consistent with expressive activity, courts consider the intended purpose of the forum and whether expressive activity would disrupt that purpose. "In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum." *Cornelius*, 473 U.S. at 804, 105 S.Ct. at 3450. Most recently, the Supreme Court distinguished between expressive activities that "happen[ ] to occur on school premises" and those school-sponsored activities that "the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 108 S.Ct. at 569. The Court held that educators are entitled to exercise greater control over "curricular" programs "to assure that the participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.* at 570.

**B. The Forums At Issue**

In cases where plaintiffs seek limited access to government property, that is, access to a particular means of communication, the relevant forums are defined by the access sought. *Cornelius*, 473 U.S. at 801, 105 S.Ct. at 3448. Here, the forums at issue are Career and Youth Motivation Days, guidance offices, and designated bulletin boards within the schools.

*1. Career and Youth Motivation Days*

▪ Whether the policy and practice of the Board demonstrate an intent to create a public forum presents a very close issue. At trial plaintiffs established several facts

in favor of finding a public forum. For example, plaintiffs established that the individual schools invited a wide variety of groups and individuals to appear at these programs and excluded specifically only the APA; that speakers were informed only of the general purpose of the program and were not limited or censored during their presentations; and that the majority of the information they seek to present is compatible with the goal of providing valid career information.

On the other hand, several facts established at trial indicate that Career Days and Youth Motivation Days have not been opened to the general public. Throughout the history of the programs individuals and groups have not attended upon their own request, but have appeared at the invitation of the school staff or of one of the organizations that worked with the schools to coordinate the career education programs. Invitations to speak at Career or Youth Motivation Day were not made indiscriminately. To the contrary, the schools specifically sought out speakers who would serve as positive role models for the students. In addition, a school staff member was always present during any presentation to a group of students, at least in part to assure that appropriate topics were discussed.

Moreover, Career Days and Youth Motivation Days were not initiated simply to convey career information to students. The programs were designed to encourage students to stay in school, to raise students' career goals, and to showcase the wide variety of opportunities that are available to all students, especially to minority and poor students. The programs are part of the general curriculum of the schools. (See Appendix A). Students are required to attend. Certainly, a speaker's message might reasonably be perceived to bear the imprimatur of the school. The ability of the educators to discriminate on the basis of subject matter and speaker identity is important to the accomplishment of the Board's curricular goals.

Thus, although the APA's presence at Career and Youth Motivation Days would not necessarily be disruptive of the purpose of the forums, a decision that the forums were created public forums could be. Therefore, the Court concludes that these programs are nonpublic forums and that the Board may make reasonable content-based access restrictions that are viewpoint neutral and that are not designed to suppress a particular point of view.

### 2. Guidance Offices and Bulletin Boards

In contrast to Career and Youth Motivation Days, the purpose of allowing outside groups to present information to students through the guidance offices and designated bulletin boards is singular: to provide students with all available information to assist them in making valid career and post-secondary choices. Student participation in meetings arranged with college or career recruiters is voluntary. And, college and career recruiters routinely initiate contact with guidance offices. The policy and practice regarding these means of communicating with students has been to hold them generally open to all groups and individuals that wish to offer students career, education, scholarship or vocational information. Indeed, the Board has conceded that the guidance offices and bulletin boards have been generally held open "to those who disseminate specific information regarding job and post-high educational opportunities." *Searcey*, 815 F.2d at n. 17. Moreover, the purpose of the forum would not be undermined by being open to information regarding the widest possible variety of options and to debate on the relative merits of the various post-secondary options. Instead, a free flow of information and debate is critical to individual students' decision making processes. Therefore, the Court concludes that the guidance offices and bulletin boards constitute created public forums for the limited purpose of presenting information regarding post-secondary pursuits.

### C. Plaintiff's First Amendment Rights

#### 1. Career Days

The Court held on August 13, 1986, that defendants had violated plaintiffs'

First Amendment rights by denying them the opportunity to present peace-oriented educational and career opportunities on school bulletin boards and in guidance offices and at Career Day Programs. Since the date of that order, the parties have been operating under a preliminary injunction. Plaintiffs now challenge the constitutional validity of the Board's Career Day policy, promulgated March 9, 1987, and Career Day Administrative Regulations, promulgated November 6, 1987. Specifically the APA challenges the requirements that presenters have "direct knowledge of the career opportunities about which they speak," and that presenters not "criticize or denigrate the career opportunities provided by other participants," and that speakers limit their presentations to providing "appropriate information." The APA contends that these requirements were formulated specifically to suppress their point of view and that the distinctions are unreasonable. The Court agrees.

In the Court's view, the requirement that the presenters have "direct knowledge" of the career fields about which they speak is no more than a thinly-veiled attempt to resurrect the "jobs-in-hand" distinction that the Court previously concluded was irrational. The restriction is not saved by the administrative regulation that describes people having "direct knowledge" of career opportunities as those who "by virtue of that person's training, education or experience ... possess[ ] sufficient knowledge such that the information to be imparted would be of use and benefit to the students in making their career choice ..." because the regulation goes on to require that each presenter have "some present affiliation or authority with that career field." The Court notes that the regulation was formulated after plaintiffs and the Court had pointed out to defendants that the "direct knowledge" requirement could be construed to exclude personnel specialists, job counselors, recruiters, etc. In this regulation the Board simply abandoned its direct knowledge requirement and substituted a present affiliation requirement. The

present affiliation or authority requirement could unreasonably exclude professional career counselors and retired people of all professions. Retired people have participated in Career Days in the past and are certainly in a position to offer high school students valuable career information and guidance. (See Attachment B to plaintiffs' motion for summary judgment filed April 15, 1985; see also Tr. at 372.) Moreover, defendants have not offered any reason why participation should be restricted to people who have "present affiliation or authority." If the restriction were allowed to stand, most APA members would be excluded from participating in Career Day because, although they offer valid information about various jobs in peace making, most of the members are not presently affiliated with specific employers. The Court finds that the restriction is unreasonable and was formulated solely in order to suppress the APA's viewpoint.

■ Similarly, the requirement that participants refrain from criticizing or denigrating the opportunities provided by other participants does not pass constitutional muster. The main purpose of the career education program has always been to enable students "to examine their attitudes, interests, aptitudes and abilities in order to relate them to career opportunities, and to make valid decisions regarding further education and future endeavors." (Board's Career Policy of 1977, D.Ex. 6.) It is almost axiomatic that a valid decision is one made after weighing pros and cons. Students certainly cannot be expected to make important career choices based only on positive information. Moreover, the schools have traditionally recognized the value of presenting both positive and negative career information and have not excluded criticism from Career Days or from the guidance offices.

The only justification offered by the Board for excluding criticism is that it might confuse the students. The Court gives this assertion no credence. First, the Board presented no evidence that students are confused by negative information.[4]

---

**4.** Defendants did introduce some evidence that students might be confused by presentation of

And, common sense would indicate that students who are mature enough to make career choices are mature enough to assess the positive and negative aspects of a job. Even if this were not so, students have access to professional guidance counselors who can answer their questions, clarify issues and guide their decision-making process. (*See* Tr. at 635–645.)

The Court concludes that the exclusion of criticism is unreasonable and was formulated solely in order to suppress the APA's viewpoint. In so holding, the Court does not rule that the school must allow the APA to present any and all material to the students. The schools may exclude material presented by any outside source that is misleading, inaccurate, sexually explicit, advocative of illegal conduct, etc. The schools may not, however, exclude information simply because it is critical of the military.

■ Plaintiffs also challenge the policy requirement that presenters "be limited to providing appropriate information about career fields." (*See* Appendix A.) "Appropriate information" is defined in paragraph 10 of the administrative regulations. (*See* Appendix B.) The portions of the regulation that define appropriate information as understandable, useful to the students, full and complete, factual and objective are not objectionable to plaintiffs. Plaintiffs argue, however, that the final sentence of paragraph 10 fails under the scrutiny applied to nonpublic forums. The sentence reads as follows:

> No presenter whose primary focus or emphasis is to discourage a student's participation in a particular field shall be allowed to participate in school Career Day programs.

(*See* Appendix B.)

As justification for this restriction, the Board points to the motivational purpose of the Career Day program. The Board argues that the intent of the program is to encourage students to pursue careers and job opportunities and that allowing a group

to appear whose primary focus is to discourage participation in a particular field is disruptive of that purpose. While this logic is not particularly compelling, the Court cannot say that the restriction is constitutionally unreasonable. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3453 (emphasis in original). However, the existence of reasonable grounds for limiting access to a nonpublic forum will not save a regulation that is in reality a facade for viewpoint-based discrimination. *Id.* at 811, 105 S.Ct. at 3454. This regulation is such a facade. Considering all the facts and circumstances involved in the promulgation of this regulation described above, the Court concludes that the regulation was impermissibly motivated by a desire to suppress the APA's viewpoint. Thus, the last sentence of paragraph 10 of the administrative regulations cannot stand.

### 2. *Youth Motivation Days*

■ By order dated August 13, 1986, the Court stated that the record was not clear whether plaintiffs had ever sought and been denied access to Youth Motivation Days. *See Searcey v. Crim,* 642 F.Supp. 313, n. 13 (N.D.Ga.1986). The record now demonstrates that at some schools Career and Youth Motivation Days are combined into one event. Thus, the APA's request for access to the career education programs necessarily included a request to appear at Youth Motivation Days. The APA also requested to be allowed to speak at "forums where pro-military speakers are present." (P.Ex. 34.) Youth Motivation Days are such a forum. Therefore, the Court concludes that the APA did seek access to Youth Motivation Days. Further, the Board's decision on October 4, 1983, completely barring the APA from the schools was a decision to deny plaintiffs access to this forum. As stated above, the purpose of the decision was to suppress the

inaccurate information. "Inaccurate" is not, however, synonymous with "negative" or "crit-

ical."

APA's viewpoint. A violation of the APA's First Amendment rights with regard to access to Youth Motivation Days was complete at that time.

It is unclear whether the Board intends to apply its Career Day policy and regulations to Youth Motivation Days. If the policy and regulations are used, they must be applied in a manner consistent with the Court's rulings above.

### 3. *Guidance Counselors' Offices and Bulletin Boards*

■ As stated above, the guidance offices and bulletin boards constitute created public forums for presentation of information designed to assist students in making post-secondary career and education choices. Although the Board may make reasonable time, place and manner restrictions regarding these forums, any content-based restriction must be narrowly drawn to serve a compelling state interest. *Searcey*, 815 F.2d at 1391.

■ In their proposed findings of fact and conclusions of law, defendants concede that plaintiffs are entitled to display educational and career oriented material in school guidance counselors' offices and on school bulletin boards, "consistent with [d]efendants' present Career Day policy." (See Defendants' Proposed Findings of Fact at 15.) The Career Day policy and regulations do not, on their face, apply to school guidance offices and bulletin boards. Because the Board has offered no compelling reason for restricting access to these forums, the Court concludes that any attempt to apply the restrictions in the policy and regulations to a created public forum would run afoul of the First Amendment.

## IV. CONCLUSION

In sum, plaintiffs are entitled to judgment and an order enjoining defendants from denying plaintiffs an opportunity to present students in Atlanta public high schools information on careers in peacemaking and on military service by placing literature on school bulletin boards and in the offices of school guidance counselors. In addition, plaintiffs are entitled to participate in Career Days in accordance with this Court's previous order and in accordance with the Board's policy and regulations regarding these programs. The portions of the policy and regulations that require presenters to have "direct knowledge" or "present affiliation or authority" with the field about which they speak, that ban criticism of other job opportunities and that exclude speakers whose primary focus is to discourage participation in a particular field are void as violative of plaintiffs' First Amendment rights. Plaintiffs are DIRECTED to submit a proposed judgment and permanent injunction within twenty days of the date of this order.

## APPENDIX A

The Board believes that schools should provide educational programs that are pertinent to the practical aspects of post-secondary life and to the world of work. The Board, therefore, supports "Career Day" programs as part of the general curriculum for our schools. "Career Day" is to be a program which allows students to gain career awareness and to explore career opportunities in various fields. Participants in "Career Day" programs shall have direct knowledge of the career opportunities about which they speak and shall be limited to providing appropriate information about career fields. Participants shall not be allowed to criticize or denigrate the career opportunities provided by other participants. Written information about career opportunities may also be made available to students at school sites subject to the conditions indicated above. Restrictions may not be imposed on the types of career opportunities in such material. The Superintendent shall prepare appropriate administrative regulations for the implementation of this policy.

## APPENDIX B

### CAREER DAY PROGRAM

Administrative Regulations

1. Any person, firm, group or organization wishing to participate in the Career

Day program should initiate its contact with the school principal.

2. Any Career Day program or its presenter(s) must have the prior approval of the school principal.

3. Any person, firm, group or organization wishing to participate in the school Career Day program must provide information to the school principal, in a form and format satisfactory to that principal, of the purpose/goals/objectives/content of the proposed Career Day program offering. The request for Career Day program participation may be denied by the school principal if curricular relevance is not identifiable within the purpose/goals/objectives/content of the program as presented.

4. In making the determination as to the curricular relevance of the proposed Career Day program presentation, the school principal or his designee may request and review any written or printed information which the presenter desires to distribute during the Career Day program. Principals are encouraged to utilize the services of the school guidance counselor in making the determination of curricular relevance and any necessary or desired review or evaluation thereof.

5. Any organization wishing to participate in a school's Career Day program must give sufficient notice of that desired participation to the school principal such that staff/student orientation, supervision, scheduling and space can be arranged for the Career Day program.

6. Requests for Career Day program participation are considered to be more timely when presented in mid-August such that activities can be included in the annual and/or guidance calendar.

7. Any person, firm, group or organization desiring to participate in a school's Career Day program, whose request for participation is denied by the school principal, may appeal that denial of such participation or any restrictions placed upon such participation by the school principal to a Central Career Day Committee to be chaired by the individual responsible at a central level for supervision of school guidance counselors, presently the Coordinator of Staff Support Services who is responsible for guidance and counseling services. Any party aggrieved by a principal's decision concerning Career Day participation may appeal such decision by filing a written request for appeal with the Coordinator of Staff Support Services who is responsible for guidance and counseling services within ten (10) days after notification of the principal's decision. Such appeal committee shall also consist of one high school principal selected annually by the committee chairperson and one guidance counselor to be selected annually by the committee chairperson. Both the Assistant Superintendent for Curriculum and Research Services and the Director of Staff Support Services shall be ex officio members of the Central Career Day (Appeal) Committee and shall be notified of and have the right to participate in any pending appeal and the determination thereof. In the event a member of the appeal committee shall have made or participated in the decision appealed from, the chairperson may appoint a replacement member for purposes of the appeal. Such appeal committee may review any documentation concerning the request, may interview any witness or witnesses it deems appropriate and shall make its decision in writing within thirty (30) days after written appeal is filed with the Coordinator of Staff Support Services. All interested parties shall be provided a copy of the decision of the appeal committee.

8. Each person, group, firm or organization participating in school Career Day programs shall be given a copy of the Atlanta Board of Education's policy on "Career Day Program (Code IDD)" and these accompanying administrative regulations prior to the program. Each participant shall be expected to follow the directives of such policy and administrative regulations in its presentation to students. In the event any person, firm, group or organization shall violate the policy or these regulations, appropriate disciplinary action shall be imposed upon such participant by the Central Career Day (Appeal) Committee, after appropriate review and right of the offender to be heard, as it deems appropriate, includ-

ing the barring of that person's, firm's, group's, or organization's further participation in school Career Day programs altogether.

9.  Presenters at a school Career Day program shall be deemed to have direct knowledge of the career opportunities about which they speak if, by virtue of that person's training, education or experience, the presenter possesses sufficient knowledge such that the information to be imparted would be of use and benefit to students in making their career choice and in understanding the career options available. Each presenter and Career Day program participant shall have some present affiliation or authority with that career field about which he or she is to make a presentation.

10.  Information concerning career fields shall be deemed appropriate if it is in a form and format such that, in the opinion of the school principal, with appropriate consideration given to the opinions and input from the school guidance counselor, the information is understandable by students and of use to students in making career choice or in understanding the career options available. Each participant shall be allowed to and expected to provide full and complete, factual and objective information about the applicable career field to students. Such information shall be conveyed in as positive and encouraging a manner as possible so as to be motivational to students. No presenter whose primary focus or emphasis is to discourage a student's participation in a particular career field shall be allowed to participate in school Career Day programs.

11.  Participants in school Career Day programs shall not be allowed to criticize or denigrate the career opportunities provided by other participants. Information provided to students at school Career Days shall be positive information regarding the career opportunities available, shall motivate students to continue their education and to consider their pursuit of the applicable career field and shall provide encouragement to students concerning the career fields at issue. While participants are expected to provide full and complete, factual, objective and accurate information concerning career fields about which they speak, no participant whose primary focus or emphasis is to discourage students from such career participation shall be allowed to participate. Encouraging student participation in a particular field, while in and of itself discouraging participation in other career fields, shall not be deemed to be criticism within the meaning of Board policy or these regulations.

12.  These regulations concerning Career Day program materials shall apply both to oral presentations and to any written material to be distributed at school Career Day.

13.  It is the intent of Atlanta Board of Education policy concerning Career Day programs and these administrative regulations to preserve the character of the public school forum as primarily educational and not as a forum for public debate on matters of politics, social issues, or other controversial matters.